Case number 20-3010. United States of America v. Shan Shi Appellants. Mr. Darrington for the appellant, Ms. Ralston for the appellate. Good morning Mr. Darrington. We will hear from you. Thank you. Good morning, Your Honor, and may it please the court. Mike Darrington on behalf of Defendant Appellant Dr. Shan Shi. Your Honors, the insufficiency of the evidence in this case is nothing short of that. Dr. Shi was convicted of one count of conspiracy to steal trade secrets, even though the government's star cooperating witness, Cui Bo, whom the government described as Dr. Shi's right-hand man, and who admitted during trial that he was highly motivated to testify against Dr. Shi, flatly denied that Dr. Shi was part of any agreement to steal or use any information from Trelleborg, the victim company. Counsel, the question that was put to him didn't say steal or use. It said steal, right? Your Honor, you're correct. The question did say steal, and the government makes much of that point by seeming to argue that Mr. Bo parsed the language of the actus reus within the statute and silently differentiated between the act of stealing and the act of using stolen information. So while Your Honor is correct that the word used was steal, we think that it's fairly clear that Bo was testifying that there was nothing, there was no information stolen, no agreement to steal information, and no agreement to use stolen information in any way. How is that consistent with our obligation to consider the evidence in the light most favorable to the government and give the government the benefit of all inferences? You want the benefit of that inference here, right? Respectfully, no, Your Honor. We think that that inference would actually be unreasonable for the jury to have concluded that Bo silently parsed the statute and quietly thought there might be an agreement to do something with stolen information, but not to steal information. And in any event, the burden here is on the government, and the government chose not to even redirect Bo, a star witness who had just denied that there had been an agreement to steal trade secrets from Trelleborg. So we think that speaks volumes. The government, rather than trying to draw, risking drawing attention to this statement that entirely exculpates Dr. She, chose to just let it be. So we think because it's the government's burden to prove that there was a conspiracy in an agreement beyond a reasonable doubt, the fact that the star witness denied that there was an agreement to steal trade secrets from Trelleborg constitutes enough that there couldn't be a reasonable inference he meant something else, that there was stolen information in play here. Dr. She met with a company called Cuming to discuss with them the possibility of some sort of a joint venture, and the evidence was that during those negotiations and discussions, she was told that Cuming's technology was proprietary, and they would not disclose specifics of their formulations for these microspheres, macrospheres. Isn't that correct? Your Honor, Cuming is an entirely different company from Trelleborg. I understand, but the point is, is that she would have learned from that that formulations of macrospheres is proprietary confidential trade secret information. Well, as an initial matter, Your Honor, I'm not sure that the record would indicate to the level of detail you're talking about, but the types of specifications that are involved with Trelleborg were actually involved with Cuming, and to contextualize the testimony regarding... You don't, you don't need to know that these specific specifications are confidential. You need to know... Let me just cut to the chase here. Doesn't that evidence, plus the fact that she saw settlement slash confidentiality agreements from two former Trelleborg employees that describe, you know, proprietary data specifications, manufacturing techniques, etc. as confidential information, doesn't that establish that she knew that this sort of specific formulation data of macrospheres was confidential information? Your Honor, respectfully, we would submit the answer to that question is no. Now, to be clear, there's two elements that are missing from the government's case, and the first one is the agreement, and the second one is the lack of... I'm going to get to the agreement in a minute, but I want to talk about whether that is sufficient to give the government adequate proof of knowledge. We would say no, Your Honor, and the reason is because these boilerplate confidentiality agreements at Trelleborg were circular in nature. They specify that confidential information and proprietary information is confidential and must be kept confidential. The question is whether Dr. She thought, whether there's proof Your Honor, reasonable doubt that Dr. She would have concluded that the particular information, putting aside Cumming, the particular information that his two employees at CMUI privately used and passed off as their own constituted confidential and trade secret information. Well, the particular information that his employees got from Trelleborg was the same type of information that Cumming had told him was proprietary. I'm not sure that we would agree with that characterization of the record, Your Honor, but moreover, there's a... What does the record say? Tell me why I'm wrong. What in the testimony said differently than that? Well, we're dealing here with seven specific pieces of information that the government has alleged constitute trade secrets and that Dr. She allegedly knew or believed constitute trade secrets, so if we're talking in particular about the specifications, as an initial matter, the evidence was wholly deficient to prove beyond a reasonable doubt that Dr. She even knew that information came from Trelleborg, those specifications. Some of them had Trelleborg, at least one spreadsheet had Trelleborg's name on it that was emailed to Dr. She. So, Your Honor, in order to develop and prove beyond a reasonable doubt knowledge that Dr. She thought that information came from Trelleborg and constituted trade secrets, there would have to be a string of inferences that starts with the inference that Dr. She opened the email. There was no metadata presented to prove that. Second, that Dr. She opened the native file of the attachment because if you print it out, as many do, when looking at hard copy, you wouldn't see the word Trelleborg at the bottom. So we can't infer that Dr. She read and opened an email that was sent to him. That's not what the jury could reasonably infer, giving the government the benefit of all inferences. In some circumstances, the jury could infer that one would look at an email that they received if, in fact, there was evidence that the person reviews their email. Some people get thousands of emails, don't even review the email. So we're not willing to concede that it's a fair inference in any circumstance. Opening an email means you're reviewing an attachment, means you're reviewing it in native, means you see the notation that says reference Trelleborg. It means that that, to you, triggers another inference on top of those inferences, that the information actually came from Trelleborg, and then on top of that, that the information constituted a trade secret and wasn't something that was even permissibly held by the person who sent it loose. Let's move on to the agreement issue. May I ask you a question first before you get into the legal question? Counsel, are you familiar with the Curley case and the Jackson case in the Supreme Court, dealing with the relationship between the requirement that the government prove its case beyond a reasonable doubt, on the one hand, and the legitimate inferences that the jury, that the government gets? Are you familiar with that case? If Your Honor would be so willing as to refresh my recollection about the specific aspects of the case at issue, I'd appreciate that. Well, this is a case that when it was the Supreme Court of the District of Columbia, the court was called that, but it was our court. And it's a very famous case, which has been followed by all the circuits, except recently by the Fifth Circuit. And it's basically called the equipoise theory, trying to figure out how you bring together the jury's obligation to decide beyond a reasonable doubt, on the one hand, with the legitimate inferences that the government gets. And the law in this circuit is, if the case is in equipoise, then the government loses in a court of appeals. Are you familiar with that case? It's certainly important to your case here. Your Honor, I see that, I'd like to answer your question, I see I'm out of time, I'd like to reserve, but I'd like to answer your question if I may. So, well, we did not... This is not a hostile question, counsel. We very much appreciate your point, Judge Silverman, and we agree with you that in this circumstance, even if the evidence were in equipoise, then the reversal, the conviction must be reversed. We think it's actually a case that if this were a civil case, a jury, rational jury, would have ruled in our favor. I mean, star witness. First of all, you should understand that there's a two-step process under our law, and it's backed up by the Supreme Court. The first is, the government gets all the legitimate inferences. Now, you argue that some of the inferences they're asserting are unreasonable, and that's an important step. But they get all the legitimate, reasonable inferences. Then, after you've done that, you compare the evidence on the other side, and if we conclude they're in equipoise, then we should reverse. That's our law. I would have thought you would have been on that, and certainly helpful to your case. Your Honor, if the court would find that to be helpful, we would be happy to submit supplemental briefing on those points, but it is... We appreciate the court's consideration of those cases, and we'll certainly take a look at how they apply in the circumstances, but we agree with the court's conclusion, or Judge Silverman's conclusion, or suggestion in that circumstance. Particularly, when the emails Judge Wilkins was mentioning, that said in that particular point, referenced Trelleborg, were sent by someone that the star witness, again, Bo, denied there was a conspiracy involvement. So, appreciate that point, Judge Silverman. Bo also testified that the information from Trelleborg was confidential. He testified to that at J 1077 and 78 on cross-examination by the defense. Well, Judge Wilkins, whether the information at issue is confidential is a, certainly a disputed issue, and depending on the particular trade seeker we're speaking about, many of the Trelleborg personnel themselves, including the president of the company and the head of innovation and technology, conceded that some of the information was unclear if there was even a requirement that they not disclose it. For instance, some of the pricing information. Other of the information was unclear to them whether it even came from Trelleborg in the first place. You're saying that there's a dispute, but that's not, as Judge Silverman said, a disputed evidence. What I'm saying to you is that Trelleborg witnesses, even if you could say that they weren't crystal clear that all of the alleged trade secrets were confidential, they were very clear that many of them were, and Bo, a co-conspirator, said that he believed that they were. So that pretty much demonstrates that your argument that the government didn't prove beyond a reasonable doubt that these were even trade secrets is one that we have to reject, doesn't it? No, Your Honor. Respectfully, what the standard is, and this is in the jury instructions in the Fifth Circuit, would be that the government had to prove beyond a reasonable doubt that Dr. Xi had knowledge or belief, and the same of at least one alleged co-conspirator, that the information was subject to reasonable measures at Trelleborg to keep it secret. So the mere fact that the information could have been confidential is plainly deficient under the case law. On top of that, even if the information were confidential, and we respectfully think the evidence shows to the contrary in many of these instances, there's insufficient evidence to prove that Dr. Xi even knew the information came from Trelleborg. Well, when Dr. Xi interviewed two of the former Trelleborg employees, they both told him during the interview that there was information that they that they could either had kept from Trelleborg or that they could get from Trelleborg that could help them do the job, right? Well, Your Honor, I would suggest that it's slightly more nuanced than that. So just to be clear, Ogo, for example, it appears volunteered that there was some information he might need to, he could reach out to friends and get, but he didn't specify that that was confidential information. He didn't specify, certainly, that it was trade secret information. He didn't specify there was information he shouldn't be able to get from Trelleborg or that wasn't available on the internet. And then, if you look at what happened next, so not only did Dr. Xi not ask him about that, never asked him to reach out to someone at Trelleborg to get information, this was just a unilateral comment during a lengthy interview. If you look at what happened next, it makes clear what Ogo's intentions were here. Ogo took the information from two of his friends, told one of them he wouldn't share, he swore to God he wouldn't share it with anyone, just needed it because it was basic information to re-familiarize himself because he had already overstated his job. Also, you're getting down into the weeds. The point I'm trying to make here is that if Dr. Xi wanted to manufacture macrospheres and he goes to the company, one of the leading company, and discusses that with them, and they tell him that the specific formulations and data with respect to that is confidential information, then he knows as a general matter that that sort of data is confidential information. And then, if he goes to hire people who were former Trelleborg employees and asks them, can you help me manufacture macrospheres, and they say yes, and that they're going to use information that they either kept from Trelleborg or would get from Trelleborg to specifically help them determine the specific formulations for macrospheres, then he knows that that information is the type of proprietary information that Cuman was protecting. And by hiring them, knowing that they're going to use that proprietary information, whether they say it or not, he's entered into a tacit agreement with them to use stolen information to do the job. Why isn't that a completely reasonable way to look at the evidence in the light most favorable to the government? Well, there are several reasons, Your Honor, and I would start with the one that the eyewitness whom the government described as Dr. Xi's right-hand man, who would have been at the center of this conspiracy, according to the government, denied that there was any such agreement. So that dispels any of those other inferences that can be stacked and suspicions that one juror might consider in a normal case. This is not a case about credibility of witnesses, the weight of evidence. So you say that our case law supports that if there's a denial, that trumps and overrules all the other evidence? Your Honor, in this particular case, and in fact, in other cases that have come before this court, I think where the decisions come out is that when the key witnesses who would know whether their defendant was involved in a conspiracy and who are highly motivated and admit that fact that they would testify against the defendant, if he was involved in the conspiracy, deny it, then yes, a rational juror would not be able to reasonably conclude that the defendant was part of the conspiracy. And in those cases, Gaskins and Wilson, for example, there were instances where there was evidence that a juror might consider of the kind that you just described, Your Honor, such as in Gaskins, the employee worked for a drug front. It was an investigation company. He called in plane tickets or had his name on the lease where the drugs were being packaged. There were bad facts in those cases. But at the end of the day, those who would have known and those who were called by the government in order to prove the element that there was an agreement denied that there was an You think that there should be a different rule for proving a conspiracy to participate in a drug offense than there should in the case of conspiracy to misappropriate trade secrets? Well, Your Honor, I'd like to answer that question. And if I may go back to some of the premises in your question, because we don't agree with some of those premises as well. But in answer to your question, we think that there is an overarching principle here, whether it be in a murder of a witness case, as with the situation and circumstances presented in the Wilson case. But the overarching principle that one can glean from those cases is that the government in conspiracy cases chooses to charge a conspiracy and get certain benefits of the doubt when it does that, as opposed to a substantive charge. And one of the things that has to prove, though, is difficult, is the agreement. So what the government does is it flips co-conspirators. And that's what it did in Gaskins, and that's what it did in Gaskins. Because these are people who wouldn't know if the defendant was involved in a charged conspiracy. And it asks them that question. In almost every case that's ever been brought by the government, the answer from the co-conspirator is, yes, this is what the defendant was involved with, with a conspiracy. These are the conversations we had about the substantive crimes that we wanted to be committed. I mean, are you suggesting that cases like Gaskins create a kind of per se rule that when the co-conspirator, when co-conspirators don't testify to the conspiracy, that there cannot be one? I mean, that seems to be over-reading Gaskins. Your Honor, it's a good question. And we certainly don't need a per se rule in order to get a reversal of the conviction in this case, which is warranted. I suppose some judges might think that this is such an obvious insufficiency and defect in the government's case when its star witnesses actually go the other way. So maybe there is some room for a per se rule here. But certainly in a sufficiency case, we don't need to rely on a per se rule here. We just need to look at the evidence in the record, the arguments in the briefs. And we think that we're confident that when the court looks at the briefs, when the court looks at the record evidence, it will conclude that it is not the first court to ever decide that in circumstances presented here where the government's co-conspirators, none of them implicate the defendant, that that can be upheld. Do you think there's something about the employer-employee relationship here that further makes the inferences reasonable, where you have a small company with only a handful of employees and an employer-employee relationship where the employer is saying, you know, you need to go out and get this type of information? And we know that he had possession of some of those documents. I mean, is there something about the employer-employee relationship that also supports the inferences? Well, again, Your Honor, we would disagree with that premise. So Dr. Shi, the evidence is clear, didn't ask Liu to go out and get any information. He didn't ask Ogo to go out and get any information. During a lengthy interview, they volunteered that they could potentially have access to some unspecified information. But your question about the employer-employee relationship, to the contrary, we think that actually created a lot of grounds for jury confusion here. Because Dr. Shi set out to run a startup, legitimate, registered, tax-funded operation. And when you do that, you hire employees with experience. You don't hire people in a startup when you're trying to create a better product who have no experience. You want to hire people who work at good companies, have their own ideas, but have the experience to be able to make spheres. And these things were around for 50 years or so. I think it was more than that. So people in the industry knew the basics of how to make spheres. So you go out and you hire people with experience. And yes, maybe some of them will say during an interview, oh, I have friends, I have work here too. That comes up in a lot of these interviews. But to think that a legitimate business somehow becomes a conspiracy because of the association, that contravenes settled Supreme Court precedent that says a mere association is not enough to demonstrate a conspiracy. So we're actually of the opposite mind, which is that the jurors might have seen two employees who had their own conspiracies in the case of Ogo and Uche. That was a two-person conspiracy. And then Lou, who acted unilaterally, and see that they're under the umbrella of this organization and default to some sort of responde superior theory of liability that imputes their conduct to Dr. Xu because it's his company, when that's contrary to well-settled case law. What about the fact that Xu, that Xu was told that this data that they were using came from Trello board? I'm sorry, Your Honor. I don't believe that that's in the record. Where specifically are you referencing? You told Xu that they were using Trello board's recipe. I'm sorry, could you give me a pin site on that? No. You're familiar with the record. I mean, there was, it's discussed in the that Lou was saying that he was concerned that Trello board would discover Xu's recipe because Xu's recipe was better, but it's an equal inference from the testimony that Lou was telling Xu that he was concerned that Trello board would discover that they had copied Trello board's recipe. Well, Your Honor, we think the testimony is actually fairly clear on that point. The government used the word stole in its brief, which appeared nowhere in the record when referring to that incident. And what actually happened according to the record is that Lou was concerned that if CBMI provided its recipe for testing and evaluation to Trello board, and its recipe was in fact proven to be better than Trello board's, the Trello board would see what the recipe is, be able to reverse engineer it and recreate it. But the record is clear that Lou wasn't concerned that, according to Bo, that Trello board would see CBMI took the recipe. Actually, to the contrary, CBMI had already provided the spheres to Trello board for testing and evaluation, and they came out better. So certainly if Dr. Xu I'm going to read to you the question and the answer. This is at J1077 and 78. So was Gang Lou expressing some concern that the spheres you were selling to Trello board had the same recipe? Yes. And this has been the presence of Shanxi. Yes. So, Your Honor, as we put it on our briefs, and I'll try to find the pin site while I speak, on, I believe it was cross-examination, Bo actually refreshed his recollection and came out the other way. He said, actually, oh, you're right. Lou was actually expressing concern that CBMI's recipe... So what if I don't think that, if I don't agree with you, that he came out the other way? If I look at this in the light most favorable to the government, what am I supposed to do with that testimony that I just read to you? Your Honor, we think that the only reasonable inference when a witness says one thing on direct testimony, says X, and then on cross-examination, the witness memory is refreshed and comes out and says not X. And on redirect, there's no change. I asked you a question. I'd like for you to answer my question because I told you that I don't agree with your characterization of what happened on redirect. So let's assume that I don't. What am I supposed to do with that testimony that I just read to you? You mean cross rather than redirect, don't you? Or cross, yeah. So, Your Honor, I want to make sure I'm answering your question properly. So the question that if Bo's testimony that Lou was concerned were not refreshed and updated, changed, depending on how you look at it, what should the court do with Lou's initial testimony? Yes. Doesn't it establish that she was told that they were using the same recipe as Trell Board? So putting aside our obvious disagreement with the premise of the question, if the testimony had stopped after the initial Lou testimony, the first thing we would point to is the fact that Bo, who is the very person testifying here, already said, he testified very clearly, there was no agreement involving Lou to steal trade secrets. So you could take your initial inference and compare it to the fact that there is no agreement, and it clearly dispels, this is not competing inferences, one piece of the direct testimony from the charged right-hand man in the middle of the conspiracy saying, you can't make that inference. And that wasn't crossed by the government. So the second point is that even taking that initial Lou testimony, we don't think that actually would constitute, putting aside the refreshing of the memory, an admission that this data came from Trell Board, or that Dr. Sheed knew it, or that Dr. Sheed actually agreed to it. Even in this kind of different factual scenario that is presented here, the case law is clear that even acquiescence or approval in the substance of crime is not enough. It's not an agreement. All right. Thank you. Any other panel members have questions? No. Go ahead. All right. We'll hear from the government. Thank you, Your Honors. Good morning, Your Honors. May it please the court. Sonia Ralston for the United States. I'd like to pick up where the panel left off with one clarification about the record, that on redirect examination, there was further clarification in Bo's testimony at pages 1154 to 1155 of the joint appendix. They talk about, was, question, was, what was gaining Lou's concerns in the conversation? Answer, about doing that TGA test. Trell Board might be able to find out the recipe of CBMI. Question, and was he concerned about whether Trell Board would know its own ingredients were in that recipe? Answer, yes. And then he says there's a different test, question, and that's a different test from the test in the email that Mr. Zeidenberg, the defense counsel, showed you. Yes. So even if you want to take the legal premise of defense counsel's argument, the factual premise is not true. He's clarified again on redirect examination, and Bo is very clear that this oral conversation occurred after the email that's very clear that the test Trell Board could do would identify that it's, it's belonging to Trell Board's recipe was being used to manufacture the spheres at CBMI. Counsel, I have a number of questions for you. First of all, I'd like to ask you, you cited two prior cases. They're not particularly relevant or crucial. One of you, parenthetical, the Kavanaugh had decided, had written the opinion, and the other, Ruth Ginsburg. Why did you do that? Why is that relevant? The two colleagues of ours who went to the Supreme Court decided that case or wrote the opinion. Why is that relevant? Do you realize that we're all equal black robe judges? Did you think we should give particular deference to the fact that a prior colleague who's now Supreme Court justice or was a Supreme Court justice wrote the opinion? No, Your Honor, not as special deference. It's just a fact that courts are sometimes interested in. It occurs. Not appropriately interested in. I think it's Bush league advocacy. Anyway, let me start. That's that annoyed me right at the start, but let me go on to say I want to pick up on a point that my colleague raised, which I think it's the key to the case. In page 22, you say first, she was the managing macro managing boss of a very small company in which two other members pleaded guilty to the charge conspiracy. If isn't that absolutely illegal for you to state that if if that argument had been made to the jury and there was an objection, what would the district judge have said? I'm sorry, Your Honor. The fact that that Ogo and Bo pleaded guilty was presented to the jury. It would have always instruction to go. The judge gave concerning that. I don't have it at my fingertips. Well, I do. It was that that you cannot use the guilty plea of these other two against she and yet you're doing it on appeal. Your Honor, it's not. I disagree, Your Honor. It's not substantive evidence of she's guilt. It is evidence that in this company there, this is not a 500 person company where he might have no idea what's going on. It's a very small company where there are only a couple of people and essentially correct counsel that the district judge properly instructed the jury. They could not take into account in determining whether she was part of a conspiracy. The two subordinates had pled guilty to a conspiracy. That's correct. The mere fact of their plea is not substantive evidence. Then why are you using it on appeal? Your Honor, it's shorthand for the fact that they admitted that they were involved in a use to infer that she is part of a conspiracy. If you had made that statement as counsel before the jury, there would have been an immediate objection and a move for a mistrial. Your Honor, they testified that they were guilty of the crime charge. That doesn't mean that she was necessarily guilty, but it is evidence that no, no, it's not evidence. It's evidence that the district district judge properly instructed the jury. They cannot use that factor as evidence against she. And yet you're using it on appeal. Now, I suspect that that's exactly why the jury decided as it did, but that's improper, isn't it? It's improper to convict someone of a conspiracy merely because their co-conspirator has pleaded guilty. That's true. I think even if my friend on the other side would agree that if someone testifies, I joined a conspiracy and the defendant was in it with me that the jury. That's not the issue you're saying here in your brief that because two other members plead guilty to the charge conspiracy and a very small company that could be used against the boss. She and that's improper. That's grotesquely improper. I apologize for the wording. The point is that two other members of the company that only had four people in it were involved in the conspiracy. They testified at trial about what was happening at the company, about their actions and about what happened in front of she. The point is, Your Honor, that in this tiny environment, it is simply implausible to conceive that she did not what was going on. I see. I guess we will just be in disagreement about whether what you did was appropriate. Let me go on to some of the other statements you make in your statement of facts. You're accurate, but in the body of the brief, it seems to me you make some misstatements. Let me start with Ogo and Leo, who both told him during their interviews that they would need Treloar data to do what she wanted them to do. Isn't that incorrect? Ogo testified that he would need the data to compare with us at 1168. Leo did not say he needed Treloar data. He said that he had kept the technical. Yes, but that is not the same thing as saying he needed Treloar data. So you misstated that. I apologize, Your Honor. And Ogo didn't say he needed Treloar data. He said he would need the data to compare with. He would need data to which he would compare the sphere he produced. And that he could get the data from Treloar. No, that's not what he said. He had friends at Treloar that he could contact to help him the data. Now, that data could be public or could be spread throughout the industry. Your Honor, I disagree that that's a fair inference. You might have argued that there's a fair inference, but you've stated flatly, which is a misstatement, that Ogo and Leo had told him during the interview that they would Treloar data to do what she wanted them to do. So I'm very troubled that that's a misstatement. Now, you might have argued that a legitimate inference could be raised to that, but you didn't say that. Now, let me go on. You said she paid Ogo substantially more than he was paid at previous jobs. What record evidence do you have of that? Isn't that a false statement? No, Your Honor, it's an inference. What do you mean it's an inference? You said she paid Ogo substantially more than he was paid at previous jobs. Do you have any evidence to support that? The evidence, the testimony, I'm looking for the page, I think it's 1069, is that he was paid more. The modifier is inference. It could have been $10. You never asked the question, how much more? It could have been $10. So where do you get substantially more? That's a misstatement, too, isn't it? Your Honor, in the argument portion of our brief, we're arguing the inferences that support... No, no, you didn't say this is an inference. You said she paid Ogo substantially more. That's a factual statement. It is not supported by anything in the record. The modifier is not in the testimony. You're darn right. It could have been $10. And obviously, it wasn't very much because you would have asked the question at trial. Now, let me go on. You say she substantially, excuse me, initially did not think Leo would be worthwhile hire and changed his mind only after he learned that Leo had kept Treloar documents. What was this business that he changed his mind? I don't see that. Your Honor, he initially did not think Leo would be worth hiring because he didn't have a PhD. And then he hired him. That is not correct. He wouldn't have interviewed him. He knew before he interviewed him that he didn't have a PhD. And he thought he might be a worthwhile hire down the line just based on his record. So he liked him. So it's not fair to say that he changed his mind about Leo being a worthwhile employee after he interviewed him. He wouldn't have interviewed him without thinking he was a possible. So again, you're exaggerating. I disagree, Your Honor. Even if he thought that down the line, Leo might be worthwhile. The fact that he hired Leo immediately after the interview and then didn't even wait for the conflict check indicates that he did have a change of heart. It's your statement that bothers me. She initially did not think Leo would be a worthwhile hire. That's not supported. Bo testified that when he first showed Leo's resume to she, she dismissed him because he wouldn't have interviewed him if he didn't think he was worthwhile. Potentially in the future. So in other words, you might have argued there's an inference you could draw from that, but you made a statement of fact, which is an exaggeration at best. Oh, now here's one that's more serious even. At page 19 of your brief, she hired both men knowing they would use Trelleborg's secrets to do their work for him. No record citations there. Isn't that a dreadful overstatement? She hired both men knowing they would use Trelleborg's secrets to do their work for him. Your Honor, that's our argument of what the inference is from the evidence. That's not what you say. That's not what you say. Respectfully, Your Honor, this is in the argument section of our brief. I know that you might legitimately argue there's an inference, but you made it as a statement of fact. And it's also quite a stretch. Now, let me go on. Because this is another statement in your brief. It was obvious that trying to extract the spheres would damage them beyond the point of useful reverse engineering. Is that obvious? Where is that in the record? Kip Carlyle testified that if you try to take the foam apart, the spheres rupture and break, and then you can't test them or see what their density is. Actually, his testimony is some reverse engineering like that is possible at varied expense, depending on how much you need to know. So again, there's nothing in the record to be true to suggest that it's obvious that it's impossible to reverse engineering spheres. So that's a misstatement too, counsel. Your Honor, there was testimony about how the GBRMs are made when you put the resin around the spheres, that it's liquid and not solidified, and it's hard. I understand. I think it's obvious that if you try to break hard plastic, it splinters. You think it's obvious, but you don't have record testimony for that at all. You have no record reference at all. And you don't argue that this is an inference I can draw from something that this is just obvious. It's not obvious at all. The testimony is contrary. Okay, how about Ogo was sending sheet testing data on spheres when CBM International had no manufacturing capacity to make spheres. This is unsupported, isn't it? It's not, Your Honor. He sent the data in January 2015, and there's testimony that they didn't develop the laboratory capacity to make the spheres until April. And that at that time, they were still trying to set up a lab. But Ogo testified that he deleted all confidential testing data and produced his own results, which he sent to Shea. He produced a template. So, why would he delete all confidential testing data and produce his own results if Shea was part of the conspiracy? So, this is Exhibit 25 that we're talking about? JA 1176. Right. So, this is the test procedure, and he takes it to make a template that he can use to show Shea how they do the test. I think if you look at the seven trade secrets, that's probably the weakest of them. If Shea is part of the conspiracy, why the devil would Ogo eliminate any reference to confidential testing data? He testified several times that he eliminated the 12-org markings in data, the markings that identify things as 12-org, because he knew that Shea was going to send them outside of the 1209. But that suggests that Shea wasn't part of the conspiracy. Respectfully, Your Honor, they made that argument to the jury, and the jury didn't buy it. I think the jury was entitled not to believe it, and that this court on the deferential review that we're here today should let the jury have that choice. Yeah, that's possible, but that's a legitimate argument, but that's not what you said in your brief. How about Ogo was prohibited from appearing at the company's booth, even though he knew the most about the product? Now, the evidence is that Shea explained that he wanted a Chinese national who speaks Chinese to represent him at the China Pavilion. Now, the jury's entitled to reasonable inferences, but isn't it much more reasonable that Shea did not want Ogo to appear because he didn't speak Chinese? It's such an obvious reason. Your Honor, I'd like to combine that piece of not appearing at the convention with two other pieces of evidence, which is that Shea told Ogo not to tell the phone suppliers that they were trying to make macrospheres, who knew that Ogo might have worked for Trailbork, and that when Shea hired Lu, he hired him at a different company to hide the fact that he was working for a Trailbork competitor. So, when you put those three things together, I think it's a fair inference that the jury could draw that what Shea was trying to do was hide the fact that he was using former Trailbork engineers to produce this product. Well, I finally make the point that throughout the brief, you make the insinuation that the guilty pleas of the subordinates should be considered by the jury in determining whether Shea was part of the agreement. And that, I think, is possibly what happened in the case, but it's certainly inappropriate. Now, one last point here. No, I have a few more. You have a statement here. Well, we've already talked about Bo. Oh, I know, here it is. This is your statement. Bo testified that he did not agree to steal the technology, but admitted in his plea agreement to have committed the charge offense, which includes possess. Thus, the jury could either have interpreted Bo's testimony in light of his plea agreement and concluded that Bo agreed to take the trade secrets, discount Bo's testimony, and credit his plea agreement. Now, again, you're using the plea agreement against Shea. Isn't that improper? No, Your Honor, we're using it to assess Bo's credibility, which is the proper use of a plea agreement admitted against a testifying witness. His credibility where he's saying something in his testimony that, you know, arguably isn't, I mean, you can interpret that he's just asking about steal and so that he's not saying he's truthful enough because we didn't steal. Do you think that's a reasonable inference? That was a point that was discussed with your colleague. But do you think that's a reasonable inference, that he would be so sophisticated a I don't think it takes sophistication to see the difference between steal and possess. Doesn't it suggest that the government didn't ask him that question because it didn't want the answer? Your Honor, I think it goes both ways. The defense only asked about steal. They didn't ask about the seven other verbs. And you're right, it wasn't addressed on redirect when it could have been. But I think the redirect was focused on things that were more interesting about his testimony, like the conversation with Lou about the testing. All right, let me go on to my last point. You say in your brief, the evidence established that Xi's plan for growing a drill riser buoyancy model was to misappropriate other technology. Isn't that false? Is that statement accurate? I'm sorry, where is that in the argument section? Page 24 of your brief. Right, okay. The evidence established that Xi's plan for growing a drill riser buoyancy module was to misappropriate others' technology. So I think that's a fair inference from the testimony, from the record, from all of the documents. Of course, it would be appropriate brief writing to argue that there's an inference here. But you just stated it as a flat fact. Your Honor, when I say the evidence established, it's fair to say that the circumstantial evidence established. As this court's precedents say, direct and circumstantial evidence are on equal footing. Do we look at the circumstantial evidence? I think it does establish that that was his plan. Because the circumstantial evidence is that he interviewed these people, and when Ogo said, I'm going to need trail board data to do my job, he hired him anyway. And when Lou said... That's an overstatement. I'm not saying I need trail board data to do my job. Your Honor, he said, I need the data. And then the next sentence is, and I could get it from my friends at trail board. What did he say exactly? He said 1168. So the data you said you would need to compare with is that something you said during the interview. That's correct. And did you indicate where you would get the data from? I remember saying that, yes, I have friends at trail board that I can contact. Yes. And did you explain what you needed the data for? Why did you need it? And then he goes on to explain how complicated it is to make the spheres. First of all, that doesn't refer to trade secrets, number one. Number two, the data could be generally known in public information. Two responses, Your Honor. I think if it were publicly known, if you could get it off the internet, he wouldn't say, I could get it from my friends at trail board. He would say, get it off the internet. My friends at Trelleborg would help me finding it. That doesn't mean it could come from Trelleborg. Your Honor, that's a competing inference that could have been drawn, and they argued that to the jury, and the jury rejected it. And the second point. I agree, but if I had been writing the brief, I would have argued that there's an inference rather than making a statement of fact. Anyway, that's not your, the most important thing that in the brief that would have been almost grounds for mistrial presented before the jury. All right, I'm finished questioning counsel. But suppose I conclude that in your argument, you've made a number of misstatements. How does that weigh in determining whether you should prevail in this case or not? Your Honor, I apologize sincerely that it came out that way. No, I'm asking unless it's correct that you've made a number of misstatements. Does that weaken your case in the Court of Appeals? No, I, if the court feels that I've handled myself poorly, then I apologize, and I will tell the department that, that you should not hold my behavior against my client. If the evidence is sufficient, the evidence is sufficient. Well, this is a, I have to look at the cases between two parties. If it was a civil case in which one of the parties made misstatements in his or her brief, I would hold that against the party. Your Honor, we pointed to the record citations that we believe support the argument. In the beginning of the argument, we've identified a law that says that the standard is to take the inferences in favor of the verdict, and that's the premise on which we made the argument. Okay. Are you familiar with the cases that I referred to when questioning your colleague? I am. You, and the way in which we should, as appellate judges, look at this case, we give you all reasonable inferences, and then conclude if the inferences or the evidence from the other side is in equipoise with yours, then we have to reverse. You're familiar with the Curley case? Yes, Your Honor, and I understand that principle. And as Your Honor articulated, the critical first step is to take the inferences in favor of the verdict. I think when you do that here, the evidence is not in equipoise. But the defense made a bunch of arguments to the jury, and they were reasonable jury arguments, and the jury rejected them. And at this point, the opposite inference is... Well, isn't the most important evidence that they had is your own witness, Bo, testified there was no agreement. I know you make the distinction between steal and use, but I don't think that's a reasonable inference. So if that's the only testimony, whether or not there was an agreement, and it runs in favor of the defendant, why isn't it necessarily the case in equipoise? So two responses, one factual and one legal. The first is that, as the district court noted, that that also could refer to whether there's a written or formal agreement, and that's not required. I frankly think that's almost a ridiculous inference. The second legal point is that there's no requirement that a particular... We have somebody answer that question. The question is, when you look at all of the evidence together, is there evidence that the defendant agreed? And there is. If you look at all of the information that he sent, the emails, there's several emails that say this information is from Trailborg right in the email. You don't even have to open the document. You're talking about the reference at the bottom of the page that... No, Your Honor. No, I'm not. So put that to the side for a second. You have in page 362, they're talking about the email. In the body of the email, it says the information received from Trailborg. And then you have, again, when they're talking about Exhibit 144, they say the reference standard of Trailborg, and that's in the email. That's at page 378 of the record. Lou says, what I provided was the protection standard of Trailborg. And that information, there's testimony at trial, matches exactly some information at Trailborg and is substantively the same as the information in Exhibits 28 and 30, which is Trade Secret 4. And that information, I think that's probably the strongest one, if you look at that, for his knowledge, because he takes 28, which is when he gets it from Lou. And he doesn't just forward that email, where you could infer that he didn't look at it or anything. He takes the document and then attaches it to a new email and sends that on to Beau. I think that that act makes it much more likely that he opened the document. When you open it, it's very obvious, right at the bottom. It says reference Trailborg. And also, that's the home run data that tells you the density of the spheres to where they're going to survive. And the fact that they survive under pressure is the important part of making a reliable product. If it's not going to survive under pressure, it can't do its job. And then you get the other data that says how many coats you have to put on it, which given the amount of competition between these companies, it's really important to not use more material than is necessary, because it's really expensive. So knowing the exact number of times to coat the sphere saves you a lot of money and a lot of time in having to figure that out. I think also in their reply brief, they want to say that we've misrepresented that Lou kept the data. And I think if you read the whole sentence at page 1066, Beau testifies. She says, yeah, Gangnu is the guy we've been looking for. And also he mentioned Gangnu kept some technical data from Trellborg. It's all one piece right there all together, that this is the same thought. I think the evidence, if you put it together, is, I think, clear, but at least rational for the jury to have concluded that she was guilty. Any further questions, Judge Rao? Judge Silberman? No, I don't. All right. Again, I apologize, Your Honor, for the wording in our brief. All right, thank you, Ms. Ralston. All right, Mr. Darrington, you were out of time, but we'll give you two minutes on rebuttal. Appreciate that, Your Honor. Just a few quick points I'd like to cover. First, appreciate the panel's careful review of the record in this case. It is extraordinarily complicated. There's thousands of pages in the exhibit, and that's one of the reasons we frankly think the jury just got it wrong respectfully. It's one of those cases. Second, the government argued it's implausible that Dr. Shi didn't know that this was going on in his company, but that statement there is almost a concession in its own right. Carelessness and not knowing that your employees are committing misconduct or not connecting the dots, as the prosecutor expressly said in closing arguments with the jury, is not an agreement, and that seems fairly clear in the case law. As to the government's point about circumstantial evidence, it's all denied by direct evidence, and while the government is correct that they weren't required to call the co-conspirators, they did, and their own co-conspirators admitted that they were highly motivated to testify against Dr. Shi for frankly some fairly particular reasons, and still one of them denied it, and the other didn't testify there was ever a conversation or agreement about stealing trade secrets. Third, as to the point about Mr. Ogo's removal of the Trello board notation before sending it to CBMF, not Dr. Shi, his explanation is simply nonsensical. I mean, CBMF was charged as a co-conspirator, so it doesn't make sense that Ogo would remove the notation to try to hide it from a co-conspirator. As for trade secret four, as we note in our brief, it's unclear that that information even came from Trello board, let alone was a trade secret, and finally, as to the, or penultimately, as to the reasonable measures argument, because we didn't get up into that much in my opening argument, that's our second argument, and there's just no evidence, certainly not enough to prove beyond a reasonable doubt, that Dr. Shi had knowledge or belief that there were reasonable measures or what they were to keep this information secret, and the government didn't even argue it as to an alleged co-conspirator, which we submit as a waiver on that point, so unless the court has other questions, we really appreciate it. Would you repeat that last point? Yes, your honor, so we argued in part for our second argument that there was insufficient evidence to prove beyond a reasonable doubt that Dr. Shi and at least one alleged co-conspirator knew or believed that the information at issue constituted a trade secret, which is a statutory term that's defined within the meaning of the statute, and from our review of the government's briefs, we actually think that that is waived. We didn't see if this fleshed out an argument, any grounds or reason why there was evidence that a co-conspirator had that knowledge or belief. It's simply the government chose not to respond to, and we think that was for a good reason, because there was little, if any, evidence that a co-conspirator knew or believed the information at issue was subject to reasonable or be, and this is less of our argument, but was independently economically valuable, and that just applies to certain of them, but the first one that there were no reasonable measures to keep it secret. While the government only needs to prove knowledge or belief that there are reasonable measures, not actual reasonable measures, it failed to satisfy that requirement, and in fact, many of the alleged co-conspirators here worked at Trelleborg, so they would have known the fact that this information wasn't kept secret. For instance, if a co-conspirator says that the evidence was confidential, you're telling me that that's not evidence that the information was subject to measures to keep it secret? Well, your honor, I'm not sure where in the record one of the co-conspirators said confidential information that was provided to Dr. Xi was confidential or that he knew it was Trelleborg. Let's assume that there is evidence in the record of that. Well, then your honor, no, the answer is no, because the statute, and this has been litigated as the jury instruction, in fact, in this case included, the case law is fairly clear, we think, that what is required is that Dr. Xi and at least one alleged co-conspirator knew that it was a trade secret, not that it was confidential. The government has frequently argued that all that necessary is that the government proved that the defendant knew or believed the information was proprietary or confidential, but that's not what the statute says. The statute defines trade secret, and it defines it in such a way that it has to be subject to reasonable measures. So in most cases, it's fairly straightforward. Most of the cases that involve conspiracy to steal trade secrets, the defendant is a company insider or a former company insider. It knows exactly how the information is treated. It's highly unusual for the government to charge a conspiracy involving an outsider in the company who didn't pay someone inside the company for the information. For example, exchanging a briefcase in a hotel room in one of the cases in order to get the information, knowing that it was subject to measures to keep it secret. So here, the government's trying to build this connect the dots theory of Dr. Xi's knowledge and agreement, and it just stretches the evidence way too far. I go back to one of the first questions that I asked during your opening argument, which was that Xi started out by trying to get this sort of data from other companies and was told that we're not giving you that data, that you can't have that data. Well, Your Honor, in that particular situation involving Cumming and Mark Schlegel, who I pitched, according to the evidence, a joint venture in which he was going to receive $6 million for a couple, he and his partner, $6 million for a couple months of work. So it's not something that Dr. Xi would have necessarily agreed that whatever unknown data, and I don't think it's clear from the record what Cumming was referring to or whether it was analogous to the data at Trelleborg, was trade secret data. But even if it were, just to be clear here, Your Honor, if Trelleborg doesn't keep the information secret and Dr. Xi doesn't know that Trelleborg kept the information secret, he doesn't have the requisite knowledge. And the government could have come in here. They could have put an expert on the stand and said that Dr. Xi, with his background and his experience, would know that this information, A, could not have been developed from CVMI, to the contrary, as a footnote. They don't need an expert when they can just argue the same thing from the inferences. I mean, what do we do with the fact that there are only four companies in the whole world that create these spheres? So we're supposed to say that the critical data that you need to produce these spheres is public, and that's why only four companies can do it? Well, Your Honor, just to clarify, CVMF, the parent company to CVMI, is a large, notable corporation that has a long history of creating, manufacturing sphere space. The testimony was that none of their spheres were qualified. You say that in your brief, and I don't have time to go through all of the misstatements in your brief, but the testimony in every instance that you cited, the person qualified it and said that they specified that the spheres that were created by the Chinese parent were not qualified spheres. Am I wrong about that? Your Honor, I'd have to check the pin site to be clear, to confirm that, but I have no reason to necessarily doubt your characterization of the testimony. But CVMF, the point is, this is not a fly-by-night operation, CVMI, that sprouted up and suddenly started trying to... If they could create these exact same spheres and be commercially successful at doing it, then why did they hire Dr. Xi and create this company to figure out how to make them? My point is that there's four companies in the whole world that you're arguing that somehow it's a stretch for a jury to infer that the precise data that you need to make them is really a trade secret, even though there's only four companies in the whole world that can make them. That's your argument? Your Honor, we're not arguing that CVMF was fully capable of manufacturing the high-quality spheres that CVMI did that exceeded Trellborg or any of this. We're arguing that the notion that CVMI had no resources, it was a startup that was heavily funded by a parent company that had a rich history of manufacturing. But to your point, the fact that there are four companies that create these spheres, these have been around for a very long time. This is not some new technology that you had to either license the information or steal trade secrets in order to do. Like any startup in an industry that has some saturation, frankly, there are four companies, but these are large companies. Like any startup, what you would do is you would proceed by trying to consider, as a business person, whether you could cheaply license the technology, and they found out that wasn't the case. So you hire people who already have the experience and know-how to come up with their own ideas about how to develop an already extant process in a way that it actually exceeds the quality and is cheaper than all of the competitors, and that's exactly what they did. So the notion that Dr. Xi, just because someone, Mark Schlegel, told him we have some information that we're willing to go in and enjoy a venture in America to tell you that, I don't think you can transpose that to a different company involving a different set of circumstances and say that's enough to satisfy a statutory element that Dr. Xi knew or believed, that at least one alleged co-conspirator knew or believed the information constituted trade secrets, especially when you have an avalanche of evidence to the contrary, such as... You've answered my question, and you've gone well over your time. We'll take the case under advisement. Thank you, counsel. Thank you very much, your honors. I appreciate it.
judges: Wilkins, Rao, Silberman